[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10445
Non-Argument Calendar

_____

Agency No. 13-0821

FLORIDA LEMARK CORPORATION,

Petitioner,

versus

SECRETARY, U.S. DEPARTMENT OF LABOR,

Respondent.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission

_____

(December 14, 2015)

Before TJOFLAT, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

This is a petition for review of a final order of the Occupational Safety and

Health Review Commission ("Commission") finding that Petitioner Florida

Lemark Corporation ("Florida Lemark") violated its general duty to keep its worksite free of hazards. On appeal, Florida Lemark contends that the finding of a worksite hazard is not supported by substantial evidence in the record. Florida Lemark also argues that it did not have constructive knowledge of the hazard, pursuant to this Court's decision in *ComTran Group, Inc. v. U.S. Department of Labor*, 722 F.3d 1304 (11th Cir. 2013), because the hazard was created by supervisor misconduct. After careful review, we deny the petition and affirm the Commission's decision.

## I.

This case arises out of a tragic incident involving the partial collapse of a nearly finished, six-story parking garage under construction on Miami Dade College's campus in Doral, Florida, on October 10, 2012.[1] The collapse killed four employees of three different employers and injured several others, including a Florida Lemark employee. It is undisputed that the collapse occurred due to catastrophic structural failure of one of the garage's supporting columns.

The garage was a "precast" structure, meaning the structural pieces of the building were manufactured off-site and erected on-site. After the foundation was poured on-site, precast columns were moved into position on the foundation by a

---

[1] *See, e.g., 2 People Dead, 1 Person Remains Trapped in Garage Collapse at Miami Dade College's West Campus: Officials*, NBC Miami, http://www.nbcmiami.com/news/Garage-Collapse-Reported-at-Miami-Dade-Colleges-West-Campus-Officials-173509351.html (last visited Nov. 20, 2015).

2

crane.  The columns were placed on metal shims—small pieces of metal used to adjust the elevation of the column—and then bolted to the foundation with four anchor bolts through a metal base plate embedded in the bottom of the column. This process left a two- to three-inch gap between the bottom of the column and the foundation.  The gap was then filled with grout cement, which has a greater weight-bearing capacity than concrete.  The shim stacks and anchor bolts could support the weight of only the column itself, but were insufficient to support the weight of the other structural pieces placed on the column later in construction.  To address this situation, the grout was to allow the column to transfer weight more effectively to the foundation and to hold the subsequent loads.  The engineering drawings for the parking garage required grout to be placed no later than forty-eight hours after each column was erected.

The construction of the parking garage was managed by Ajax Building Corp. ("Ajax").  Other companies were hired to complete specific parts of the project, including (a) MEP Structural Engineering and Inspection, Inc. ("MEP"), which inspected construction and ensured compliance with construction plans; (b) Solar Erectors, Inc. ("Solar"), which erected the precast pieces at the construction site; and (c) Florida Lemark, the petitioner in this case, which grouted the various pieces that made up the structure.

3

Following the collapse of the parking garage, the Occupational Safety and Health Administration ("OSHA") investigated the worksite and then issued Florida Lemark, among others, a citation alleging that it failed to keep its worksite free of hazards. OSHA specifically alleged a "serious" violation of the "general duty clause," which requires employers to keep their worksites "free from recognized hazards that are causing or are likely to cause death or serious physical harm" to their employees. *See* 29 U.S.C. § 654(a)(1). According to the citation, Florida Lemark exposed its employees to a recognized hazard—being struck by and caught in between collapsing pre-cast structural members—by not performing grouting on the bases of two columns, identified as columns "B3" and "A3.3."

## II.

The Occupational Safety and Health Act (the "Act"), 29 U.S.C. § 651, *et seq.*, gives the Secretary of Labor ("Secretary"), and by extension OSHA, the authority to commence enforcement actions against employers to ensure compliance with the Act. The overarching purpose of the Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Once OSHA issues a citation to an employer, the employer may contest the citation and request a hearing before an administrative law judge ("ALJ"). *See generally ComTran Grp., Inc.*, 722 F.3d at 1306-07 (explaining the statutory and regulatory scheme under the Act).

Florida Lemark contested its citation, and an ALJ held an evidentiary hearing to resolve the contest. The ALJ heard testimony from OSHA investigators and various persons involved in the construction of the parking garage. Notably, the ALJ heard from the following persons: Mohammad Ayub, who headed OSHA's investigation into the collapse; MEP's director of engineering, who testified about MEP's inspection records; and Ajax's director of risk management, who indicated that an engineering firm hired by Ajax found evidence of grout under column B3.

Ayub, an expert in the field of forensic structural engineering, testified about his investigation of the worksite for OSHA and his conclusions that columns B3 and A3.3 had not been grouted. He explained that the lack of grout under column B3 led to that column's failure and the partial collapse. He also stated that the lack of grout under column A3.3 posed a similar risk of collapse, though it was not the cause of the collapse in this case.

MEP's director of engineering testified about MEP's inspection records, which indicated that MEP inspected column B3 after it was erected on September 13, 2012. The report prepared for that inspection noted that grouting would be inspected at a future date, which meant, according to the director, that grout was "not present" at the time of the inspection. The director also testified that he could find no inspection report showing that column B3 had been grouted.

5

Ajax's director of risk management, Marc Reeves, testified that he was privy to emails discussing the work of an engineering firm that Ajax had hired to investigate the collapse. According to Reeves, the engineering firm's testing had indicated the presence of grout under column B3. The firm purportedly determined that the grout had a high water content, which potentially could have caused the collapse. The purported engineering report was not introduced at the hearing, nor did someone with the engineering firm testify about the report.

Following the hearing, the ALJ issued a decision affirming the citation and assessing a penalty of $6,300.00. The ALJ conducted a five-step analysis to determine whether the Secretary had met its burden of showing a violation of the general duty clause. First, the ALJ found that an activity or condition at the site constituted a "hazard" under the Act. Crediting Ayub's testimony, the ALJ found that the Secretary had proved by a preponderance of the evidence that columns B3 and A3.3 had not been grouted. According to the ALJ, no other credible evidence contradicted Ayub's conclusions and testimony. For example, no witness testified that either column had been grouted. The only evidence contradicting Ayub's testimony, the ALJ stated, was "unreliable hearsay statements testified to by Mr. Reeves," whose testimony the ALJ explicitly did not credit.

Second, the ALJ found that the possibility of structural collapse due to the failure to grout supporting columns was a condition known to be hazardous by

Florida Lemark and the precast concrete construction industry. Third, the ALJ found that the hazard was likely to cause death or serious physical harm. Florida Lemark does not challenge the ALJ's findings on these two points.

Fourth, the ALJ found that feasible means existed to eliminate or materially reduce the hazard. Specifically, Florida Lemark could have followed the construction plans and ensured that columns were grouted within forty-eight hours of being erected. The ALJ found that Florida Lemark had no rule or procedure for tracking or determining when grouting had been done. Rather, Florida Lemark relied on others both to inform it both when grouting was necessary and if there were any deficiencies in the grouting. The ALJ found that Florida Lemark could have undertaken measures to ensure that inspections of its grouting were complete before a column was loaded.

Finally, the ALJ determined that Florida Lemark had constructive knowledge of the condition, despite its lack of actual knowledge. In other words, the ALJ concluded that Florida Lemark could have discovered the condition with the exercise of due diligence. According to the ALJ, Florida Lemark knew which elements were being erected each day and had supervisors on-site on a regular basis, but Florida Lemark conducted no routine inspections of the work its employees performed, nor did it keep track of the columns it had grouted. Instead, Florida Lemark relied on Solar and MEP to conduct inspections. Thus, the ALJ

7

found that Florida Lemark did not have an effective safety program because it failed to take reasonable steps to monitor compliance with safety requirements.

The ALJ also rejected Florida Lemark's reliance on this Court's decision in *ComTran Group*. The ALJ found that *ComTran Group* concerned the special circumstance of a hazard created by the unforeseeable misconduct of a supervisor, whereas this was "the ordinary case" where the hazard was created by subordinate employees and should have been discovered by a supervisor through the exercise of due diligence.

Florida Lemark sought discretionary review of the ALJ's decision before the Commission. *See* 29 C.F.R. § 2200.91(b). The Commission declined review, and Florida Lemark now brings this petition for review.[2] *See* 29 U.S.C. §§ 660(a) & 661(j).

## III.

We review findings of fact by the ALJ to determine whether they are supported by substantial evidence on the record as a whole.[3] 29 U.S.C. § 660(a)

---

[2] We asked the parties a jurisdictional question regarding the timeliness of Lemark's petition for review. *See* 29 U.S.C. § 660(a) (providing that a petition for review must be filed with an appropriate court of appeals within sixty days of the date of the final order). Having reviewed the parties' responses to our question, we are satisfied that the petition was timely filed and that we have jurisdiction over Lemark's petition.

[3] Because the Commission declined review, the ALJ's order became the final order of the Commission. *See* 29 U.S.C. § 661(j). Therefore, we review the ALJ's decision under the same standards as we would a decision issued by the Commission. *See Safeway, Inc. v. Occupational Safety & Health Review Comm'n*, 382 F.3d 1189, 1192-93 (10th Cir. 2004).

8

("The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."); *J.A.M. Builders, Inc. v. Herman*, 233 F.3d 1350, 1352 (11th Cir. 2000). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *J.A.M. Builders, Inc.*, 233 F.3d at 1352 (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). "[T]he legal determinations of an agency like the [Commission] are to be overturned only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" *Fluor Daniel v. Occupational Safety & Health Review Comm'n*, 295 F.3d 1232, 1236 (11th Cir. 2002).

## IV.

To show a violation of the general duty clause, the Secretary must prove five things: (1) a hazard existed; (2) the employer or the industry recognized the hazard; (3) the hazard was likely to cause death or serious physical harm to employees; (4) a feasible means existed to mitigate or eliminate the hazard; and (5) employer knowledge of the hazard. *See Safeway, Inc. v. Occupational Safety & Health Review Comm'n*, 382 F.3d 1189, 1195 (10th Cir. 2004); *cf. ComTran Grp., Inc.*, 722 F.3d at 1307. Florida Lemark challenges only whether a hazard existed and, if it did, whether it had knowledge of the hazard. We address each contention separately.

## A.

Substantial evidence supports the ALJ's determination that a hazard existed at the worksite because no grout was placed under columns B3 and A3.3.  The ALJ reasonably relied on Ayub's testimony in concluding that columns B3 and A3.3 had not been grouted.  Ayub was an expert in the field of forensic structural engineering[4] who had investigated approximately seventy-nine prior structural collapses, including ten parking garages using precast concrete.  Ayub explained that he conducted a thorough, two-day search for any trace of grout at the base of column B3 but could find none.  Based on visual inspection and comparison with other columns that had been grouted, he concluded that neither column B3 nor A3.3 had been grouted.  In crediting Ayub's testimony, the ALJ also reasonably relied on the lack of credible evidence contradicting it.  No witness with knowledge testified that those columns had been grouted, and no documentary evidence, such as inspection reports, indicated that the columns had been grouted.

Florida Lemark contends that Ayub's testimony fails to establish the existence of a hazard because he examined the column's base after the site had been cleaned up, he conducted no testing of the material under column B3, and he "recanted" his testimony about the presence of grout under column B3 when

---

[4] Forensic structural engineers investigate and determine the causes of structural failure.

10

shown a pre-clean-up photograph of the bottom of the collapsed column. We disagree.

First, substantial evidence supports the ALJ's determination that Ayub, as an expert with considerable expertise, would have been able to make a visual inspection to determine the presence of grout even after the clean-up. Ayub testified without contradiction that he would have been able to see signs of grout on the underside of the column base plates, which were still intact, despite the clean-up, and without the need for testing. Ayub also explained that grout looks different than precast concrete, that column B3 had been carefully hand-cleaned with brush and broom, and that he compared columns A3.3 and B3 with other columns that had been grouted.

Second, Ayub did not "recant" his testimony regarding the absence of grout under column B3, as Florida Lemark contends. During cross-examination by Florida Lemark's counsel, counsel presented Ayub with a photograph of the bottom of column B3 before clean-up. Ayub acknowledged that he could not "rule out the possibility" that darker material in the photograph was grout, but he then clarified that he did not think it was grout, and at no point did he indicate that the picture changed his conclusions regarding the lack of grout under column B3. In sum, the ALJ permissibly relied on Ayub's testimony as evidence of the lack of grouting.

11

Florida Lemark also contends that the ALJ ignored or improperly discredited other evidence indicating that grout was present under column B3. Again, we disagree. The ALJ gave good reasons for her decision to discredit Reeves's testimony that the engineering firm found the presence of grout, as it was based on hearsay statements regarding an unreleased and unfinished report. Moreover, no evidence was presented to the ALJ that substantiated the purported conclusion of the report, such as documentation or live testimony from an engineer with the firm.[5] In making her credibility determination, the ALJ also relied on Reeves's demeanor, finding that he was a "reluctant" witness. Consequently, substantial evidence supports the ALJ's decision to discredit Reeves's testimony.

In addition, evidence that no one at the construction site noticed or was aware that column B3 had gone ungrouted does not compel an inference that grout was present. Indeed, the fact that column A3.3 was not grouted—a finding Florida Lemark does not challenge—supports the ALJ's decision not to infer the presence of grout from the fact that the lack of grouting went unnoticed for over twenty days. Assuming it would have been permissible for the ALJ to find in Florida Lemark's favor on this point, there is sufficient evidence to support the ALJ's

---

[5] The fact that OSHA earlier was made aware of the same purported engineering report is not significant because the record reflects that OSHA was never provided a copy of the report or some other documentation to substantiate the report's conclusions.

contrary determination that grout was not present under column B3. *See Fluor Daniel*, 295 F.3d at 1241.

Finally, Florida Lemark makes a cursory challenge to the finding of a hazard with respect to column A3.3, claiming that the load on the column was of "little significance." However, a "hazard" refers to the risk of injury as a result of the condition, not the proximate cause of the accident in this case. *See Safeway, Inc.*, 382 F.3d at 1195 n.5. Here, Ayub testified that the risk of collapse is present once workers start loading ungrouted columns and that the lack of grout under column A3.3 posed "great risk of collapse." And there is no dispute that column A3.3 had been loaded or that collapsing columns posed a hazard to employees. Thus, although column A3.3 did not in fact collapse, substantial evidence supports the ALJ's finding that the lack of grout under column A3.3, like the lack of grout under column B3, was a hazard.

In sum, the ALJ's decision to credit Ayub's testimony is supported by substantial evidence, and his testimony, in addition to other record evidence, provides sufficient evidence to support the ALJ's finding of a hazard due to the lack of grouting under columns B3 and A3.3.

**B.**

The Act imposes liability on the employer for a serious violation "only if the employer knew, or 'with the exercise of reasonable diligence, [should have known]

13

of the presence of the violation.'"  *W.G. Yates & Sons Construction Co., Inc. v. Occupational Safety & Health Review Comm'n*, 459 F.3d 604, 607 (5th Cir. 2006) (quoting 29 U.S.C. § 666(k)).  Thus, the Secretary must show either that the employer had actual knowledge or constructive knowledge of the violation.  *ComTran Grp., Inc.*, 722 F.3d at 1307-08.  There is no evidence of actual knowledge in this case.  Therefore, the Secretary needed to show constructive knowledge—that Florida Lemark could have discovered the hazard with the exercise of reasonable diligence.

We have identified two ways in which the Secretary can show constructive knowledge.  First, constructive knowledge may be shown "where the supervisor may not have directly seen the subordinate's misconduct, but he was in close enough proximity that he should have."  *Id.* at 1308.  Second, "the Secretary can show knowledge based upon the employer's failure to implement an adequate safety program, with the rationale being that—in the absence of such a program—the misconduct was reasonably foreseeable."  *Id.* (citation omitted).  The employer can avoid liability by showing that the violation was the result of "unpreventable or unforeseeable employee misconduct."  *Id.*

Here, substantial evidence supports the ALJ's determination that Florida Lemark had constructive knowledge of the hazard because it failed to take reasonable steps to monitor compliance with safety requirements.  *See id.*; *N.Y.*

14

*State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 105-06 (2d Cir. 1996) ("[C]onstructive knowledge may be predicated on an employer's failure to establish an adequate program to promote compliance with safety standards."). The record establishes that Florida Lemark knew which elements were being erected each day but that it conducted no routine inspections of the work its employees performed, nor did it kept track of the columns it had grouted or train its employees what to do if a column went ungrouted. Nothing prevented Florida Lemark from taking steps to ensure that grouting was inspected, and therefore completed, before columns were loaded. Consequently, substantial evidence supports the ALJ's determination that Florida Lemark failed to implement an adequate safety program to ensure that grouting was performed before columns were loaded.

Florida Lemark's reliance on *ComTran Group* is misplaced.[6] *ComTran Group* concerns when knowledge of a supervisor can be imputed to the employer for purposes of establishing employer knowledge. In the "ordinary case," a supervisor's knowledge is imputed to the employer. *ComTran Grp., Inc.*, 722 F.3d at 1308 & n.2. However, the "ordinary case" is distinct from one where the supervisor is the "actual malfeasant" who creates the hazard. *Id.* at 1308 n.2.

---

[6] *ComTran Group* expressly did not concern proving "constructive employer knowledge based on the employer's inadequate safety program." 722 F.3d at 1311. For that reason alone, Lemark's arguments are misguided.

Recognizing that distinction, we held in *ComTran Group* that showing misconduct by a supervisor alone is not sufficient to prove employer knowledge. *Id.* at 1316. Rather, "employer knowledge must be established, not vicariously through the violator's knowledge, but by either the employer's actual knowledge, or by its constructive knowledge based on the fact that the employer could, under the circumstances of the case, foresee the unsafe conduct of the supervisor [that is, with evidence of lax safety standards]." *Id.* at 1316.

Here, even assuming that the hazard was created by a Florida Lemark supervisor's failure to follow the erection guidelines, that unsafe conduct would still have been reasonably foreseeable to Florida Lemark. As we have noted, Florida Lemark had no rule or procedure in place for tracking or determining when grouting had been done or ensuring that it had been inspected. As a result, the supervisor's failure to track what grouting had been performed and whether it had been inspected followed naturally from the lack of rule or procedure. Therefore, constructive knowledge was established because the alleged misconduct was reasonably foreseeable. *See id.* at 1308 & n.3.

In its reply brief, Florida Lemark argues that the measures identified by the ALJ are not reasonable means to monitor compliance with safety standards. We decline to consider this belated argument because it was raised for the first time in Florida Lemark's reply brief. *See United States v. Levy*, 379 F.3d 1241, 1244 (11th

16

Cir. 2004) ("[T]his Court . . . repeatedly has refused to consider issues raised for the first time in an appellant's reply brief.").

## V.

Overall, substantial evidence supports the ALJ's determinations that a hazard existed due to Florida Lemark's failure to grout columns B3 and A3.3 and that Florida Lemark had constructive knowledge of the hazard as a result of its lack of an adequate program to monitor compliance with safety requirements. Therefore, we **DENY** Florida Lemark's petition for review and **AFFIRM** the ALJ's decision finding that Florida Lemark committed a serious violation of the general duty clause, 29 U.S.C. § 654(a)(1).